1      UNITED STATES DISTRICT COURT
2         DISTRICT OF PUERTO RICO

3   MARTA MARRERO-ROSADO, on behalf
4   of her minor son JLSM,
5
6       Plaintiff,                        Civil No. 05-2063 (SEC/JAF)

7       v.

8   AGUSTÍN CARTAGENA, et al.,

9       Defendants.


10                        **OPINION AND ORDER**

11      Plaintiff Marta Marrero-Rosado ("Rosado"), on behalf of her son

12   Jorge Luis Santos Marrero ("JLSM"), brings this action against

13   Defendants Agustín Cartagena ("Cartagena"), Juan R. Díaz-Román

14   ("Román"), Nelson F. Maldonado-Santiago ("Santiago"), Miguel A.

15   Pereira ("Pereira"), Ramón Díaz-Correa ("Díaz"), Dra. Ana Rius-

16   Armendáriz (Armendáriz), Agents A, B, and C, Correctional Officers D,

17   E, and F, Doctors G, H, and I, Lady Jane J, K, L, M, N, O, and

18   Insurance Companies X, W, Z. Docket No. 1 and 51. Before the court

19   are Defendants' Motion for Summary Judgment and Memorandum of Law

20   ("Defendants' Motion") and Defendants' Motion to Strike Plaintiff's

21   Response thereto. Docket Nos. 121 and 138. Defendants' Motion to

22   Strike is **DENIED.** Defendants' Motion has been considered and is

23   **GRANTED in part.**

Civil No. 05-2063 (SEC/JAF)                                    -2-

I.

**Introduction**

This case is an action for money damages brought pursuant to 28 U.S.C. §§ 1331, 1343, and 1367 and 42 U.S.C. § 1983 against representatives of the Puerto Rico Police Department, Puerto Rico Department of Corrections, and the Puerto Rico Medical Center (Administración de Servicos Médicos de Puerto Rico). Plaintiff alleges that his father, Maldonado, suffered and died due to the actions or omissions of Defendants. Docket No. 51, ¶4.18. Claims are brought by Rosado on behalf of her son, JLSM. Docket No. 51, at 2, II.

Plaintiff's Section 1983 claims are brought against Defendants in their official and personal capacities for the alleged violation of the Fourth, Fifth, Eighth, and Fourteenth Amendments of the U.S. Constitution. Docket No. 137, at 22. Supplemental claims are brought under Sections 3018 (Fraud, negligence, or delay in fulfilling obligation), 3019 (Liability arising from fraud), 3024 (Losses and damages for which debtor liable), and 5141 (Obligation when damage caused by fault or negligence) in Title 31 of the Laws of Puerto Rico.

With the exception of Section 1983 claims brought against Defendant Román, the only defendant to have any direct interaction with Maldonado, Plaintiff's Section 1983 claims are premised on a theory of supervisory liability. Plaintiff's claims against Defendant

Civil No. 05-2063 (SEC/JAF)                                        -3-

1    <u>Román</u>, a Puerto Rico police officer in the Vega Baja Precinct, are

2    based on allegations that Román physically struck Maldonado on two

3    occasions and filed a false incident report. <u>Docket No. 51, ¶ 3.2</u>.

4    <u>Defendant Santiago</u> was a supervisor of Officer Román during the

5    relevant time period. Plaintiff's claims against Santiago are based,

6    in part, on an allegation that Santiago approved Román's allegedly

7    false incident report. <u>Docket No. 51, ¶ 3.4</u>. Santiago had no direct

8    interaction with Maldonado during the relevant time period.

9    <u>Defendant Cartagena</u> was the Superintendent of the Puerto Rico Police

10   at the time of the alleged beating and false report, but Cartagena

11   had no direct interaction with Maldonado or involvement with his

12   case. <u>Docket No. 51, ¶ 3.1</u>. Plaintiff's claims against Santiago and

13   Cartagena are also based upon their alleged failure to supervise

14   operations of the Vega Baja Precinct and adequately institute a

15   protocol for police officers on how to handle street people with drug

16   addictions. <u>Docket No. 51, ¶ 4.19</u>.

17       <u>Defendant Pereira</u> was the Secretary of Corrections at the time

18   Maldonado was incarcerated, but had no direct interaction with

19   Maldonado or involvement in his case. <u>Docket No. 51, at ¶ 3.4</u>.

20   <u>Defendant Díaz</u> was the Superintendent of the Bayamón Correctional

21   Complex at the time of Maldonado's incarceration but had no direct

22   interaction with Maldonado or involvement in his case. <u>Docket No. 51,</u>

23   <u>¶ 3.5</u>. Plantiff's claims against Defendants Pereira and Díaz are

24   based on their alleged failure to supervise and maintain adequate

Civil No. 05-2063 (SEC/JAF)                                        -4-

1   detox facilities and failure to institute or train employees on a

2   protocol for the handling of "street people" with drug addictions.

3   Docket No. 51, ¶¶ 3.4, 3.5, and 4.15.

4       Defendant Armendáriz was the Executive Director of the Puerto

5   Rico Medical Center during the time Maldonado was a patient at that

6   facility, but had no direct interaction or involvement with

7   Maldonado's case. Docket No. 51, ¶ 3.6. Plaintiff's claims against

8   Armendáriz are based upon Armendáriz' alleged failure to "establish,

9   implement, and/or make sure, that his employees followed a protocol"

10  for the care and treatment of "street people" with drug addictions,

11  and to ensure the ongoing availability of lab services and adequate

12  nursing services. Docket No. 51, ¶¶ 3.6 and 4.16.

13                                   **II.**

14                          **Factual Background**

15      We review the facts supported by the record. On September 27,

16  2004, Román was on patrol with Officer Juan M. Pérez Luciano

17  ("Luciano") when he observed Maldonado, a "deambulante" (homeless

18  man), at Sánchez López Street in Alto Cuba, Vega Baja. Defts' SUMF

19  Nos. 3, 5 and 7; Pltf's Exhibit No. 5; Pltf's Reply ¶ 2. Román

20  observed Maldonado "walking in a negligent manner, moving from side

21  to side of the street, and lying down in the middle of the street."

22  Defts' SUMF No. 6; Pltf's Exhibit No. 5; Pltf's Reply ¶ 2. It is

23  undisputed that Maldonado used illegal drugs. Docket No. 51, at 6.

24  Presumably, Román was aware of Maldonado's habit on September 27,

Civil No. 05-2063 (SEC/JAF)                                                    -5-

1    2004, because Román had previously counseled Maldonado about his drug

2    addiction. Defts' SUMF No. 4. At 12:15 p.m., Román issued a citation

3    to Maldonado for violation of Law 22, Art. 9.02, of the Transit Law.

4    Defts' SUMF No. 8. The citation required Román to appear before a

5    Judge on September 28, 2004, at 8:30 a.m. Defts' SUMF No. 8, 11, 13,

6    and 14. Román was not incarcerated on September 27, 2004. Defts' SUMF

7    No. 10.

8        Román's description of his intervention with Maldonado is

9    corroborated by the written statement of Officer Luciano, provided to

10   the Superintendent of Public Integrity, Police of Puerto Rico, on

11   January 4, 2005. Luciano's statement reads as follows: "Juan Díaz

12   Román proceeded to intervene with the individual that afterwards

13   resulted to be called Jorge Santos Maldonado, for art. 9.02(6) Law

14   22, reading him the legal warnings, then we proceeded to take him

15   before the presence of the Honorable Judge José V. Meléndez that

16   found cause, fixing a bond of $200 dollars, that he did not post,

17   same being carried to Bayamón Jail 705." Pltf's Exhibit No. 5

18   (emphasis supplied); Plaintiff's Reply, ¶ 2. It is not clear from

19   Luciano's statement as to exactly when they proceeded to take

20   Maldonado before the Judge.

21       Román avers that he has never hit Maldonado. Defts' SUMF No. 9.

22   But, Plaintiff submits the sworn statement of Ramón Luis Martínez

23   Vélez (Vélez), who avers that in August 2004 he witnessed Román hit

24   Maldonado on the neck with his hand and in the lower part of the

Civil No. 05-2063 (SEC/JAF)                                        -6-

1    stomach with a black-jack. <u>Pltf's Exhibit No. 1</u>. Vélez also avers

2    that he witnessed Román hit Maldonado, arrest him, and take him away

3    on the morning of September 27 or 28 at approximately the same time

4    Román issued Maldonado the citation. <u>Id.</u>

5        Until Román's intervention with Maldonado, the Superintendent of

6    Public Integrity received no complaints concerning Román since his

7    admission on March 8, 2005. <u>Defts' SUMF No. 62</u>. On October 13, 2004,

8    Maldonado's father, Nicolás Santos Santos ("Santos"), filed the first

9    complaint on record against Román, alleging that Román arrested

10   Maldonando without cause. <u>Defts' Exhibit No. 19</u>. In response, the

11   Director of the Division of Public Integrity in the Puerto Rico

12   Police Department completed an investigation and found no cause for

13   or evidence to support Santos' complaint. <u>Defts' SUMF No. 64</u>; <u>Defts'</u>

14   <u>Exhibit 20</u>. As noted by Plaintiff, the Director's report indicates

15   that Román's intervention with Maldonado occurred on September 26,

16   2004, and not September 27, 2004. <u>Id.</u> But, Plaintiff himself alleges

17   that the intervention occurred on September 27, 2004. <u>Pltf's Reply</u>

18   <u>¶ 2</u>.

19       In September 2004, Defendant Cartagena was Superintendent of the

20   Puerto Rico Police Department. <u>Docket No. 51, at 2, ¶3.1</u>; <u>Defts' SUMF</u>

21   <u>No. 57</u>. Cartagena is not now and was not in September 2004 Román's

22   direct supervisor. <u>Defts' SUMF No. 60</u>. Cartagena has never met

23   Plaintiff or his father, and did not confer with any police officers

Civil No. 05-2063 (SEC/JAF)                                              -7-

1    or others regarding the handling of Maldonado's case. <u>Defts' SUMF</u>
2    <u>Nos. 58, 59 and 61</u>.

3        According to the complaint, Maldonado appeared by himself before
4    Judge José V. Meléndez at 9:30 a.m. on September 28, 2004. <u>Defts'</u>
5    <u>SUMF No. 14</u>. Finding probable cause, Judge Meléndez set trial for
6    November 8, 2004. When Maldonado was unable to post bail, Judge
7    Meléndez ordered that Maldonado be remanded to the Bayamón
8    Correctional Facility. <u>Defts' SUMF Nos. 16 and 17</u>; <u>Docket No. 137, at</u>
9    <u>02-03</u>; <u>Pltfs' Exhibit Nos. 2 and 3</u>. As noted by Plaintiff, the date
10   of Judge Meléndez' signature on the complaint originally indicated
11   January 27, 2004, but would appear to have been subsequently changed
12   to January 28, 2004. <u>Pltfs' Exhibit Nos. 2 and 3</u>. The Magistrate's
13   secretary, however, wrote on the same complaint that Maldonado
14   appeared in court on September 28, 2004. <u>Id.</u>

15       On September 28, 2004, a police officer (not Román) delivered a
16   copy of the complaint to Santos, Maldonado's father. <u>Pltf's Exhibit</u>
17   <u>No. 6</u>; <u>Pltf's Reply ¶4</u>. The complaint provided to Santos was not
18   signed by Judge Meléndez. <u>Pltf's Reply ¶2</u>; <u>Pltf's Exhibit No. 3</u>.

19       Pursuant to Judge Meléndez' order, on September 28, 2004, Román
20   brought Maldonado to the Bayamón Correctional Facility, Bayamón
21   No. 705. <u>Defts' SUMF No. 24</u>. At Bayamón No. 705, Román filled out the
22   pre-admission form, indicating that, in his opinion, Maldonado was in
23   good physical shape, was not bleeding, was not in any medical danger,
24   was not unstable, did not show suicidal tendencies, made no attempt

Civil No. 05-2063 (SEC/JAF)                                         -8-

1    to escape, and did not need immediate medical attention. Defts' SUMF

2    No. 25. Román did not indicate on the pre-admission form that

3    Maldonado was under the influence of any drug or had a history of

4    drug abuse. The pre-admission form does not specifically request this

5    type of information, however. Docket No. 137, at 15. Defendants

6    represent that when Maldonado arrived at Bayamón No. 705, someone

7    asked Maldonado if he was "in need of immediate medical attention,"

8    "had ever received medical attention in Bayamón 705," and "in need of

9    certain medicines." Defts' SUMF Nos. 26, 27, and 28. Notations in the

10   pre-admission form indicate that these questions were answered in the

11   negative, either by Maldonado or for him. Defts' Exhibit No. 16.

12        During September and October 2004, Defendant Pereira was the

13   Secretary of Corrections and Defendant Díaz was the Regional Director

14   for the Northern Region of the Administration of Corrections, a

15   region which included Bayamón No. 705. Defts' SUMF No. 18, 31, and

16   32; Docket No. 51, ¶¶ 3.4, 3.5. Under Pereira and Díaz, the

17   Department of Corrections had a protocol for the care and treatment

18   of prisoners who are drug addicts, which included the use of a detox

19   facility. Defts' SUMF Nos. 21 and 22; Defts' Exhibit Nos. 2 and 3.

20   Neither Defendant Díaz nor Defendant Pereira have ever met Plaintiff

21   or his father and neither conferred with anyone in any way concerning

22   Maldonado's case. Defts' SUMF Nos. 19, 20, 23 and 36.

23        The Subdirector of the Administration of Corrections, Ramón Luis

24   Díaz Correa, who is not a named defendant in this case, avers that he

Civil No. 05-2063 (SEC/JAF)                                    -9-

1    received reports from a Superintendent and on-duty Commander, that

2    upon admission, Maldonado was immediately referred to "Infirmary 448

3    of Bayamón's 308 Institution." <u>Defts' SUMF 29</u>; <u>Defts' Exhibit Nos. 4</u>

4    <u>and 17</u>. On September 29, 2008, "Infirmary 448 of Bayamón's 308

5    Institution" referred Maldonado to the Puerto Rico Medical Center

6    emergency room because he had high blood pressure and "tachycardia."

7    <u>Defts' SUMF 29</u>; <u>Defts' Exhibit Nos. 4 and 17</u>. The Puerto Rico Medical

8    Center admitted Mr. Maldonado at 6:21 p.m. on September 29, 2004.

9    <u>Defts' SUMF 37</u>; <u>Defts' Exhibit 8(a) and 17</u>; <u>Docket No. 137, at 6.</u>

10   <u>¶ 4.11</u>.

11        Medical records detail Maldonado's condition and the care he

12   received at the Puerto Rico Medical Center until his death on

13   October 4, 2004. <u>Defts' Exhibit No. 8</u>. The majority of Maldonado's

14   medical records submitted by Defendants are illegible and, therefore,

15   offer limited support for Defendants' Motion.[1] Maldonado's admission

16   record, dated September 29, 2004, indicates that upon admission,

17   Maldonado was in withdrawal from heroin and cocaine. <u>Defts' Exhibit</u>

18   <u>No. 8(b)</u>. At 7:28 p.m. on September 29, 2004, the Radiology Division

19   completed a "Chest PA" exam. <u>Defts' Exhibit No. 8</u>. The Radiology

20   report indicates that Maldonado was suffering from tachypnea and in

21   drug withdrawal. <u>Defts' Exhibit No. 8</u>. Medical records indicate that

---

[1] In the future, the court recommends that the parties reproduce any illegible medical records using a word processing program for submission to the court, with affidavits validating the accuracy of copy.

1    attending physicians or nurses made a written record of Maldonado's

2    condition at 8:45 a.m, 11:00 a.m., and 11:45 a.m. on September 30,

3    2004, at 9:45 a.m., 2:00 p.m. and 4:00 p.m. on October 1, 2004, and

4    at 7:00 p.m. and 9:00 p.m. on October 2, 2004. Defts' Exhibit No. 8;

5    Pltf's Exhibit No. 11; Pltf's Reply ¶ 8. A physician's note made at

6    9:00 p.m. on October 2, 2004 indicates that labs were unavailable due

7    to a system shutdown. Defts' Exhibit No. 8. Certain lab analyses were

8    run, including two for "hematology" on October 2 and 3, 2004, and one

9    for "coagulation" on October 3, 2004. A record entitled, "death

10   summary," indicates that nurses found Maldonado in cardiorespiratory

11   arrest at 6:30 a.m. on October 3, 2004, and that attempts were made

12   to resuscitate him. Defts' Exhibit No. 8. The attending physician

13   declared Maldonado dead at 6:40 a.m. Id.

14       On October 5, 2004, after Santos made repeated inquiries as to

15   his son's whereabouts, the police informed Santos of his son's death.

16   Pltf's Reply ¶5; Pltf's Exhibit No. 6. On October 7, 2004, Santos

17   identified his son's body at a forensic medical laboratory. Pltf's

18   Exhibit No. 7; Pltf's SUMF No. 7; Defts' Exhibit No. 9.

19       On February 22, 2005, Dr. Rodríguez issued a Forensic Medical

20   Report, detailing the autopsy results. Defts' Exhibit No. 9. The

21   report indicates that Maldonado died of natural causes, including

22   "cardiac arrhythmia associated with intramyocardial pathway of the

23   left coronary artery" and "chronic drug use." Defts' Exhibit No. 9.

24   Maldonado's death certificate, based on Dr. Rodríguez' report,

indicates the same. Defts' Exhibit No. 10. Dr. Rodríguez' report does not indicate that she found any recent marks, bruising or external injury on Maldonado's body. Defts' Exhibit No. 9; Defts' SUMF No. 51.

During September and October 2004, Armendáriz was the Executive Director of the Puerto Rico Medical Services Administration (Administración de Servicios Médicos de Puerto Rico). Docket No. 51, at 2, ¶3.6; Defts' Exhibit No. 5. Armendáriz does not know Plaintiff or his father. Defts' SUMF No. 54 and 55. No person directly responsible for the care and treatment of Maldonado from the time of his admission on January 29, 2004, until his death on October 4, 2004, conferred with Armendáriz regarding Maldonado's care or treatment. Defts' SUMF No. 38.

On November 15, 2006, the Puerto Rico Medical Services Administration's Office of Legal Advice and Labor Relations issued an investigative report detailing events leading up to the death of Maldonado. Like the Forensic Medical Report, the investigative report lists the cause of Maldonado's death to be "cardiac arrhythmia" and "chronic narcotism" ("narcotismo crónico"). Pltf's Exhibit No. 9; Pltf's Reply ¶11.

At the time of his death, Maldonado was in the custody of Manuel Vélez Medina ("Medina"), an Officer of the Department of Corrections. Pltf's Exhibit No. 8; Pltf's Reply ¶8. Plaintiff submitted a logbook entry, that would appear to have been written and signed by one Officer Medina. Plft's Exhibit No. 8; Docket No. 145. According to

Civil No. 05-2063 (SEC/JAF)                                    -12-

1    the log, Medina made an entry in the logbook after returning to

2    Bayamón 705 from the Puerto Rico Medical Center at approximately

3    9:50 a.m. The log indicates that Medina witnessed the medical team[2]

4    perform what they themselves called "Respiratory Therapies" on

5    Maldonado after finding him in physical distress the morning of

6    October 3 2004. According to the logbook, Medina inquired with two

7    different physicians as to the cause of Maldonado's death.

8    Maldonado's emergency room physician, Carlos Tejeda, informed Officer

9    Medina that Maldonado died because he "suffered some secretions which

10   provoked some kind of asphyxia," but did not mention "cardiac

11   arrhythmia." Doctor Lesliane Castro Santana of Internal Medicine, who

12   certified Maldonado's death, informed Medina that the cause of death

13   was "cardiac infarction produced by cocaine and pneumonia." Pltf's

14   Reply ¶8; Pltf's Exhibit No. 8.

15                              **III.**

16                      **Procedural Background**

17       To clarify claims pending upon the filing of Defendants' Motion,

18   we review the court's prior partial judgment. On June 19, 2006, the

19   court entered partial judgment on three motions to dismiss, or

20   alternatively, for a more definite statement pursuant to the court's

---

[2] According to the logbook entry, the "medical team" consisted of Dr. Carlos Tejeda, an emergency room physician, Dr. Lesliane Castro Santana, of Internal Medicine, who certified Maldonado's death, and the following five nurses: Doris Dávila Cirino, Jesús Navarro, Araseli Matos, Francisca Castro, and Ana Figueroa.

1    Opinion and Order of the same date. <u>Docket Nos. 7, 15 and 31</u>. The

2    court's entry of partial judgment dismissed with prejudice: (1) all

3    § 1983 claims brought by then Plaintiff Santos and JLSM, in their

4    personal capacity; (2) all Plaintiffs' § 1985 claims; (3) all

5    Plaintiffs' claims against Defendant Puerto Rico Medical Center and

6    Defendants Díaz, Armendáriz, Pereira, Cartagena, and Santiago in

7    their official capacities; and (4) granted moving Defendants' request

8    for a more definite statement. <u>Docket Nos. 39 and 41</u>. The court

9    ordered Plaintiff to file an amended complaint pursuant to deadlines

10   established in the court's forthcoming Case Management and Scheduling

11   Orders. Such amended complaint was to (1) "include an averment as to

12   the capacity in which [Plaintiff] is suing" and (2) "specify what

13   constitutional rights of decedent they allege were violated and, as

14   to each violation, which Defendant or Defendants they allege is

15   responsible." <u>Id.</u>

16       On July 7, 2006, Plaintiff untimely filed Plaintiff's Amended

17   Complaint.[3] <u>Docket Nos. 51</u>. Plaintiff's Amended Complaint wholly

18   disregards the court's order, failing to specify "the constitutional

19   rights . . . they allege were violated and . . . which Defendant or

20   Defendants they allege is responsible." Defendants answered

21   Plaintiff's Amended Complaint without objection, however. <u>Docket</u>

22   <u>No. 53</u>.

_____

[3] Subsequent to the filing of Plaintiff's Amended Complaint, Plaintiff
successfully petitioned for leave to amend. <u>Docket No. 61</u>.

Civil No. 05-2063 (SEC/JAF)                                          -14-

1        On October 7, 2009, Defendants filed the pending Motion for

2    Summary Judgment and Memorandum of Law followed by supporting

3    exhibits. Docket Nos. 121 and 125. In their Motion, Defendants argue

4    for the first time on record that Plaintiff failed to comply with the

5    court's order to amend. Docket No. 121, at. The court granted

6    Plaintiff two extensions of time to file his response to Defendants'

7    Motion. Docket Nos. 127 and 135. Despite the court's leniency, on

8    December 5, 2008, Plaintiff filed his response two days late. Docket

9    No. 137. Even more troublesome, Plaintiff's response fails to clearly

10   admit, deny or qualify Defendants' statement of material facts. Id.

11   As required, we considered all facts not clearly denied, to be

12   admitted. Fontanez-Nuñez v. Janssen Ortho LLC, 447 F.3d 50 (1st Cir.

13   2006). On January 26, 2009, Defendants filed their Reply to

14   Plaintiff's Opposition. Docket No. 149.

15                                  **IV.**

16                               **Analysis**

17   **A.   Standard of Review**

18       The standard for summary judgment is straightforward and well-

19   established. A district court should grant a motion for summary

20   judgment "if the pleadings, depositions, and answers to the

21   interrogatories, and admissions on file, together with the

22   affidavits, if any, show that there is no genuine issue as to any

23   material fact and the moving party is entitled to a judgment as a

24   matter of law." Fed. R. Civ. P. 56(c). A factual dispute is "genuine"

1    if it could be resolved in favor of either party, and "material" if

2    it potentially affects the outcome of the case. Torres-Martinez v.

3    Puerto Rico Dept. of Corrections, 485 F.3d 19, 22  (1st Cir.

4    2007)(citing Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19

5    (1st Cir. 2004)).

6        The moving party carries the burden of establishing that there

7    is no genuine issue as to any material fact; however, the burden "may

8    be discharged by showing that there is an absence of evidence to

9    support the nonmoving party's case." See Celotex Corp. v. Catrett,

10   477 U.S. 317, 325 (1986). The burden has two components: (1) an

11   initial burden of production, which shifts to the non-moving party if

12   satisfied by the moving party; and (2) an ultimate burden of

13   persuasion, which always remains on the moving party. See Freadman v.

14   Metropolitan Property and Cas. Ins. Co., 484 F.3d 91, 99-100 (1st

15   Cir. 2007).

16       The non-moving party "may not rest upon the mere allegations or

17   denials of the adverse party's pleadings, but . . . must set forth

18   specific facts showing that there is a genuine issue for trial." FED.

19   R. CIV. P. 56(e). Summary judgment cannot be defeated by relying on

20   "improbable inferences, conclusory allegations, or rank speculation."

21   Ingram v. Brink's, 414 F.3d 222, 228-29 (1st Cir.2005). Summary

22   judgment exists "to pierce the boilerplate of the pleadings and

23   assess the proof in order to determine the need for trial."

24   Euromodas, Inc. v. Zanella, 368 F.3d 11, 16-17 (1st Cir. 2004)(citing

1    <u>Wynne v. Tufts Univ. Sch. of Med.</u>, 976 F.2d 791, 794 (1st Cir.

2    1992)).

3    **B.   Plaintiff's Section 1983 claims against Defendants' Pereira,**
4         **Santiago, Cartagena, Armendáriz, Díaz and Román, in their**
5         **official capacities.**

6

7         Defendants argue for dismissal of Plaintiff's Section 1983 claims

8    against Defendants Pereira, Cartagena, Armendáriz, Díaz-Correa, and

9    Díaz-Román in their official capacity on the ground that such claims

10   were previously dismissed by the court with prejudice. Indeed, we

11   dismissed Plaintiff's Section 1983 official-capacity claims in our

12   prior Opinion, Order, and Partial Judgment, holding that Defendants

13   are entitled to Eleventh Amendment immunity. <u>Docket No. 39 and 40</u>

14   (June 19, 2006). Plaintiff nevertheless attacks the court's prior

15   partial judgment, arguing that Defendants "do not qualify for any

16   immunity." <u>Docket No. 137</u>, at 22.

17        In support of his argument, Plaintiff relies solely on an excerpt

18   from the United States Supreme Court's opinion in <u>Padilla Román v.</u>

19   <u>Hernández Pérez</u>, 381 F.Supp. 2d 17 ("Third, a citizen may seek

20   monetary damages against a state officer for acts done while the

21   officer was acting in his or her official capacity.") (citing

22   Kentucky v. Graham, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114

23   (1985)). Plaintiff's reliance on <u>Padilla</u> and <u>Kentucky</u> is misplaced.

24   In <u>Padilla</u>, this court relied on <u>Kentucky</u> for the proposition that "a

25   citizen may seek monetary damages against a state officer for acts

26   done while the officer was acting in his or her official capacity."

Civil No. 05-2063 (SEC/JAF)                                   -17-

1   But, the above language from <u>Padilla</u> refers to Section 1983 suits

2   brought against state officers in their personal capacity, not their

3   official capacity. This is evident on review of the Supreme Court's

4   opinion in <u>Kentucky</u>.[4] <u>Kentucky</u> reiterates the difference between

5   official-capacity and personal-capacity suits brought pursuant to

6   Section 1983, namely, that citizens may seek monetary damages against

7   state officers in their personal capacity for acts done while acting

8   in their official capacity. <u>Kentucky</u>, 473 U.S. at 166, 105 S.Ct. at

9   3105, 87 L.Ed.2d 114 (1985) ("On the merits, to establish personal

10  liability in a section 1983 action, it is enough to show that the

11  official, acting under color of state law, caused the deprivation of

12  a federal right.") (citing <u>Monroe v. Pape</u>, 365 U.S. 167, 81 S.Ct.

13  473, 5L.Ed.2d 492 (1961)).

14      It is well-established that an award of damages in federal court

15  against state officers sued in their official capacity under Section

16  1983 is barred by the Eleventh Amendment. <u>See</u> <u>Docket No. 39</u>, at 14-

17  16. The court's prior Partial Judgment stands as the law of the case.

18  <u>Gener-Villar v. Adcom Group</u>, Inc., 530 F.Supp.2d 392, 403, fn 7

19  (D.P.R. 2007) ("the law of the case . . . is invoked to require a

20  court to follow its own rulings in a case"). Accordingly, Plaintiff's

21  Section 1983 claims brought against Defendants in their official

---

[4] In <u>Kentucky</u>, the Supreme Court held that a prevailing plaintiff cannot recover attorney's fees from a governmental entity pursuant to 42 U.S.C. § 1988 when they sue governmental employees in their personal capacities and prevail.

Civil No. 05-2063 (SEC/JAF)                                           -18-

1    capacity are **DISMISSED** pursuant to the court's prior Opinion, Order

2    and Partial Judgment. <u>Docket Nos. 39 and 40</u>.

3    **C.   <u>Plaintiffs' Section 1983 claims against Defendants' Pereira,</u>**
4    **<u>Santiago, Cartagena, Armendáriz, Díaz and Román in their personal</u>**
5    **<u>capacities.</u>**
6
7          Defendants present two arguments in support of summary judgment

8    on   Plaintiff's   Section   1983   personal-capacity   claims.   First,

9    Defendants contend that Plaintiff's Amended Complaint fails to state

10   a Section 1983 personal-capacity claim against Defendants because

11   Plaintiff's claims are based on conduct carried out "under color of

12   state law." <u>Docket No. 121</u>, at 05-06. Defendants' argument is

13   untenable. Clearly, Plaintiff's Amended Complaint refers to the

14   conduct of Defendants acting "under color of state law," but this

15   allegation is necessary, not detrimental, to Plaintiff's Section 1983

16   personal-capacity claims. Personal liability in a Section 1983 action

17   is predicated on a "[state] official, acting <u>under color state law</u>,

18   causing the deprivation of a federal right." <u>Hafer v. Melo</u>, 502 U.S.

19   21, 25, 112 S.Ct. 358, 362, 116 L.Ed.2d 301 (1991) (emphasis

20   supplied).

21        Second, Defendants contend that Plaintiff's Section 1983

22   personal-capacity claims should be summarily dismissed because

23   Plaintiff fails to establish a causal connection between the conduct

24   of Defendants and the alleged deprivation of rights, privileges or

25   immunities secured by the Constitution. Defendants' second argument

26   is well-taken.

1    The essential elements of a section 1983 claim are that (1) "the

2    defendants acted under color of state law" and (2) "the defendants'

3    conduct worked a denial of rights secured by the Constitution or by

4    federal law." Rodriguez-Cirillo v. Garcia, 115 F.3d 50, 52 (1st

5    Cir.1997) (citing Martinez v. Colón, 54 F.3d 980, 984 (1st Cir.1995)).

6    To satisfy the second element, "plaintiffs must show that the

7    defendants' conduct was the cause in fact of the alleged

8    deprivation." Rodriguez, 115 F.3d at 52 (citing Gutierrez-Rodriguez

9    v. Cartagena, 882 F.2d 553, 559 (1st Cir.1989)) (emphasis supplied).

10   Supervisory liability under 42 U.S.C. 1983, "cannot be predicated

11   on a respondeat superior theory . . . but only on the basis of [the

12   supervisor's] own acts or omissions." Seekamp v. Michaud, 109 F.3d

13   802, 808 (1st Cir.1997) (citing Sanchez v. Alvarado, 101 F.3d 223, 227

14   (1st Cir.1996)).

15   [A] supervisor: can be held liable . . . if (1)
16   the behavior of [his] subordinates results in a
17   constitutional violation, and (2) the
18   [supervisor]'s action or inaction was
19   'affirmative[ly] link[ed]' to that behavior in
20   that it could be characterized as 'supervisory
21   encouragement, condonation or acquiescence' or
22   'gross negligence amounting to deliberate
23   indifference.' Moreover, the indifference
24   required to support supervisory liability under
25   section 1983 must be "deliberate, reckless or
26   callous.' Thus, the 'affirmative link' required
27   between the action or inaction of a supervisor
28   and the behavior of subordinates 'contemplates
29   proof that the supervisor's conduct led
30   inexorably to the constitutional violation.'

_Id._ (citations omitted). In determining supervisory liability under Section 1983 for a constitutional violation, an important factor to consider is whether the official was put on some kind of notice of the alleged violations. Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 902 (1ˢᵗ Cir.1988).

> [O]ne cannot make a 'deliberate' or 'conscious' choice to act or not to act unless confronted with a problem that requires the taking of affirmative steps. Once an official is so notified, either actually or constructively, it is reasonable to infer that the *failure* to take such steps, as well as the actual *taking* of them constitutes a choice 'from among various alternatives.'

_Id._ (citations omitted). It is critical to remember when considering the liability of a supervisor for an alleged constitutional violation that a "constitutional violation by a subordinate is a predicate to a supervisor's liability." Mendez v. Toledo, 968 F.Supp. 27, 36 (D.P.R. 1997). A supervisor cannot be held accountable if his or her subordinate did not violate a constitutional right. _Id._

Having thoroughly combed the record, the court now considers Defendants' alleged conduct against the above authority. Docket No. 137, at 22.

**1.    Plaintiff's Section 1983 claims against Defendant Román in his personal capacity.**

Plaintiff generally contends that Román's actions violated Maldonado's right to life, physical integrity, freedom from bodily harm, and due process of law in violation of the Fourth, Fifth,

1   Eighth, and Fourteenth Amendments. Docket No. 137, at 22. The Eighth

2   Amendment is not applicable here because there was never a formal

3   adjudication of guilt through the criminal prosecution of Maldonado.

4   McLeod-Lopez v. Algarin, 2009 WL 736118, *5; Martinez-Rivera v.

5   Sanchez-Ramos, 498 F.3d 3, 8 (1st Cir.2007)("because there had been

6   no formal adjudication of guilt against [Plaintiffs] at the time of

7   the alleged constitutional deprivation, the Eighth Amendment is

8   inapplicable and any claim brought on that theory was properly

9   dismissed."). Furthermore, "excessive force" claims like Plaintiff's

10  are not actionable under the Fifth and Fourteenth Amendments. Graham

11  v. Connor, 490 U.S. 386, 395 (1989) ("all claims that law enforcement

12  officers have used excessive force-deadly or not-in the course of

13  . . . [the] 'seizure' of a free citizen should be analyzed under the

14  Fourth Amendment and its 'reasonableness' standard, rather than under

15  a 'substantive due process' approach."); Terry v. Ohio, 392 U.S. 1,

16  16 (1968)(writing that the Fourth Amendment applies "whenever a

17  police officer accosts an individual and restrains his freedom to

18  walk away."). We, therefore, limit our analysis to Román's liability

19  for an alleged "unreasonable seizure" in violation of the Fourth

20  Amendment.

21      Under the Fourth Amendment, all persons are entitled to be

22  "secure in their persons . . . against unreasonable searches and

23  seizures." In a traditional sense, a "seizure" occurs "[o]nly when

24  the officer, by means of physical force or show of authority, has in

1   some way restrained the liberty of a citizen." <u>Terry</u>, 392 U.S. at 19,

2   n.16. More recent jurisprudence would require "an intentional

3   acquisition of physical control" and a "governmental termination of

4   freedom of movement through means intentionally applied." <u>Brower v.</u>

5   <u>County of Inyo</u>, 489 U.S. 593, 596-97, 109 S.Ct. 1378, 103 L.Ed.2d 628

6   (1989). To prevail on a claim for violation of the Fourth Amendment

7   based on the use of excessive force, a plaintiff must show that the

8   defendant officer employed an unreasonable amount of force under the

9   circumstances. <u>Mcleod-Lopez v. Algarin</u>, 2009 WL 736118, *7 (D.P.R.

10  2009); <u>Jennings v. Jones</u>, 499 F.3d 2, 11 (1st Cir.2008). A Fourth

11  Amendment reasonableness inquiry is an objective test, to be

12  determined "in light of the facts and circumstances confronting [the

13  officer], without regard to their underlying intent or motivation."

14  <u>Graham</u>, 490 U.S. at 397. Facts of particular relevance include "the

15  severity of the crime at issue, whether the suspect poses an

16  immediate threat to the safety of the officers or others, and whether

17  he is actively resisting arrest or attempting to evade arrest by

18  flight." <u>Id.</u> at 396.

19      A Fourth Amendment violation may also occur when persons acting

20  under color of state law maliciously prosecute baseless criminal

21  charges, provided that such prosecution occasions "a deprivation of

22  liberty consistent with the concept of a seizure." <u>Nieves v.</u>

23  <u>McSweeney</u>, 241 F.3d 46, 54 (1st Cir.2001); <u>Britton v. Maloney</u>, 196

24  F.3d 24, 28 (1st Cir.1999). Notably, it is the deprivation of liberty

1    resulting from the prosecution, not the prosecution itself, that

2    triggers a Fourth Amendment claim under Section 1983. What suffices

3    for a "seizure" arising from prosecution of unfounded charges varies

4    among the circuits. We need not review these cases in depth here for

5    the reasons provided below. See, e.g., Gallo v. City of Philadelphia,

6    161 F.3d 217, 222 (3rd Cir.1998) (concluding that conditions imposed

7    on pretrial release, including the payment of a bond and restrictions

8    on travel, effected a seizure).

9        We now turn to whether the evidence submitted by Plaintiffs in

10   support of their allegations is sufficient to sustain a claim against

11   Román for violation of the Fourth Amendment under either of the

12   aforementioned theories. Plaintiff's Section 1983 claims against

13   Román for the alleged "unreasonable seizure" of Maldonado in

14   violation of the Fourth Amendment are based, in part, on allegations

15   that Román filed an "untrue report and complaint," acts which led to

16   Maldonado's incarceration pending trial for the alleged violation of

17   Law 22, Art. 9.02G of the Transit Law. Docket No. 51, ¶¶ 3.2, 4.1,

18   4.3, 4.4, 4.8, and 4.13. The incarceration of Maldonado may

19   constitute an unreasonable seizure in violation of the Fourth

20   Amendment if Román in fact issued the citation for violation of

21   Traffic Law 22 without cause. The evidence simply does not support

22   such a conclusion, however. Plaintiff offers no evidence to counter

23   the sworn statement of Defendant Román that he found Maldonado

24   "walking in a negligent manner, moving from side to side of the

Civil No. 05-2063 (SEC/JAF)                                        -24-

1    street, and lying down in the middle of the street," Officer

2    Luciano's corroborating testimony, and a finding of probable cause by

3    Judge Meléndez. Defts' Exhibit No. 6. Accordingly, we find that the

4    incarceration of Maldonado pending trial did not constitute an

5    unreasonable seizure in violation of the Fourth Amendment.

6        Regarding the alleged use of excessive force by Román against

7    Maldonado, the evidence is not so heavily weighted. Plaintiff submits

8    the eyewitness testimony of Vélez, who avers that in mid-August, he

9    saw Román hit Maldonado in the back of the neck with his hand and in

10   the lower stomach with a black-jack. Vélez further avers that he

11   witnessed Román "hit" Maldonado again on September, 27, 2004.

12   Defendants counter Vélez' version of the events with the sworn

13   statement of Román and a statement provided by Officer Luciano in an

14   investigative interview. Luciano was with Román when he intervened

15   with Maldonado on September 27, 2004, but apparently not in August

16   2004. Luciano's statement as to what occurred on September 27, 2004,

17   makes no reference at all to physical abuse. But, Luciano's statement

18   does not expressly state that such abuse did not occur.

19       In consideration of the above submissions, we find an issue of

20   material fact to exist regarding Plaintiff's Section 1983 claim

21   against Román for the alleged violation of Maldonado's right to be

22   free from unreasonable seizure. Under the record presently before the

23   court, summary disposition of Plaintiff's Fourth Amendment claim

24   against Román would, therefore, be inappropriate. Accordingly,

Civil No. 05-2063 (SEC/JAF)                                    -25-

1   Defendants' Motion on Plaintiff's Section 1983 claims against

2   Defendant Román in his personal capacity for violation of the Fourth

3   Amendment is hereby **DENIED**.

4        **2.    Plaintiff's Section 1983 claims against Defendants Santiago**
5             **and Cartagena in their personal capacities.**

6        There is no evidence in the record to affirmatively link the

7   conduct of Defendant Santiago, Officer Román's supervisor, and

8   Defendant Cartagena, the Superintendant of Puerto Rico Police, to the

9   allegedly unconstitutional intervention by Román. Plaintiff does not

10  deny that Defendants Cartagena and Santiago had no direct involvement

11  with Maldonado's case. There is no evidence in the record to suggest

12  that Román conferred with Cartagena or Santiago regarding events that

13  occurred on September 27, 2004, when Roman intervened with Maldonado.

14  Although Santiago signed Román's incident report, there is no

15  evidence before the court to suggest that Santiago did so

16  understanding the report to be false. There is simply no connection

17  between the conduct of Cartagena and Santiago and the allegedly

18  unconstitutional conduct of Román. Accordingly, Defendants' Motion on

19  Plaintiff's Section 1983 claims against Defendants Santiago and

20  Cartagena in their personal capacities is **GRANTED**.

21       **3.    Plaintiff's Section 1983 claims against Defendants Pereira**
22            **and Díaz in their personal capacities.**

23       There is no evidence in the record to affirmatively link the

24  conduct of Defendant Pereira, the Secretary of Corrections, or

25  Defendant Díaz, the Superintendent of Bayamón Correctional Complex,

1   to the incarceration and treatment of Maldonado in "Infirmary 448."

2   More  importantly,  there  is  no  clear,  underlying  constitutional

3   violation by subordinate employees, a prerequisite to supervisory

4   liability.

5        Contrary to Plaintiff's assertions, at the time of Maldonado's

6   incarceration in "Infirmary 448 of Bayamón's 308 Institution," the

7   Correctional Health Services Program had an established protocol for

8   the  caring  of  inmates  with  drug  addictions.  <u>Docket  No.  133</u>.

9   Noticeably absent from the record, however, is any evidence that

10  employees of the Department of Corrections deviated from the guide's

11  prescriptions or that Defendants encouraged, condoned or acquiesced

12  in such behavior. There is not a scintilla of evidence to support

13  Plaintiff's Section 1983 personal-capacity claims against Defendants

14  Perira  and  Díaz.  Accordingly,  Defendants'  Motion  on  Plaintiff's

15  Section 1983 claims against Defendants Pereira and Díaz is **GRANTED.**

16       **4.   <u>Plaintiff's Section 1983 claims against Defendant Armendáriz</u>**
17            **<u>in his personal capacity.</u>**

18       There is no evidence in the record to affirmatively link the

19  conduct of Defendant Armendáriz, the Executive Director of the Puerto

20  Rico Medical Center, to the care and treatment of Maldonado while he

21  was a patient at the Puerto Rico Medical Center. It is undisputed

22  that Defendant Armendáriz never met Maldonado and did not confer with

23  attending  physicians,  nurses,  or  other  employees  regarding

24  Maldonando's  care  and  treatment.  Plaintiff  appears  to  base

Civil No. 05-2063 (SEC/JAF)                                      -27-

1   Armendáriz' liability solely on Armedáriz' alleged failure "to
2   establish, implement, and/or make sure, that his employees followed
3   a protocol" for the care and treatment of street people with drug
4   addictions. Defendant Armedáriz does not dispute Plaintiff's
5   assertion that such a protocol did not exist. But, the court finds
6   the existence or nonexistence of such a protocol to be
7   inconsequential. It is the primary mission of the Puerto Rico Medical
8   Center to provide medical care to people who are ill. An established
9   protocol for the treatment of each type of illness would hardly seem
10  necessary.

11      That said, Plaintiff's submissions do raise some interesting
12  issues. With the support of medical expert testimony, Maldonado's
13  medical records may create an issue of fact as to whether Maldonado
14  received adequate attention after 9:00 p.m. on October 2, 2009.
15  Defts' Exhibit No. 8. A medical expert's opinion on reports provided
16  by doctors to Officer Medina may bring into question whether the
17  forensic medical report accurately documented Maldonado's cause of
18  death. But again, there is no evidence in the record before this
19  court that Defendant Armendáriz encouraged, condoned or acquiesced in
20  the delivery of substandard care to Maldonado or a misdiagnosis as to
21  his cause of death. Accordingly, Defendants' Motion on Plaintiff's
22  Section 1983 claims against Defendant Armendáriz in his official
23  capacity is **GRANTED.**

Civil No. 05-2063 (SEC/JAF)                                        -28-

1                                    **V.**

2                               **Conclusion**

3          For the reasons stated above, Defendants' Motion for Summary

4     Judgment is **GRANTED in part.** Plaintiff's Section 1983 claims against

5     all Defendants in their official capacities are **DISMISSED** pursuant to

6     the court's prior Opinion, Order, and Partial Judgment. <u>Docket</u>

7     <u>Document Nos. 39 and 40</u>. Defendants' Motion on Plaintiff's Section

8     1983 claims against Defendants Santiago, Cartagena, Pereira, Díaz,

9     and Armendáriz in their personal capacities is **GRANTED.** Having

10    summarily disposed of Plaintiff's Section 1983 claims against

11    Defendants Santiago, Cartagena, Pereira, Díaz, and Armendáriz,

12    Plaintiff's supplemental claims brought pursuant to 28 U.S.C.

13    § 1367(a) against the same Defendants are **DISMISSED** with prejudice.

14    28 U.S.C. § 1367(c)(3).

15         Following disposition of Defendants' Motion, the issue remaining

16    to be adjudicated in this case is Plaintiff's Section 1983 claim

17    against Defendant Román for an alleged Fourth Amendment violation.

18         **IT IS SO ORDERED.**

19         San Juan, Puerto Rico, this 27th day of March, 2009.

20                                         S/José Antonio Fusté
21                                         JOSE ANTONIO FUSTE
22                                         Chief U. S. District Judge